1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEBRASKA

3

4   UNITED STATES OF AMERICA,      )   4:05CR3019
                                   )
5           Plaintiff,             )
                                   )     TRANSCRIPT
6      vs.                         )  (Pages 1 to 63)
                                   )
7   KHALAT JAMALTHAEAL ALAMA,      )
                                   )
8           Defendant.             )

9

10      Hearing held before the Honorable David L.

11  Piester, United States Magistrate Judge, on August

12  31, 2005, in Lincoln, Nebraska.

13

14

15  APPEARANCES:

16  Ms. Sara E. Fullerton
    Assistant U.S. Attorney
17  100 Centennial Mall North
    Suite 487, Federal Building
18  Lincoln, Nebraska 68508          for Plaintiff

19

20  Mr. Michael D. Gooch
    Attorney at Law
21  12826 Shirley Street
    Omaha, Nebraska 68144            for Defendant
22

23

24

25

```
 1                        I-N-D-E-X

 2    WITNESS            Direct   Cross   Redirect  Recross

 3    FOR THE PLAINTIFF:
      1.  Kirk McAndrew    5       25      41,46
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  (On August 31, 2005, at 2:12 p.m., the following

2  proceedings were held:)

3                THE COURT:  Sorry for the

4  interruption and the delay.  My apologies.

5    Ms. Fullerton.

6                MS. FULLERTON:  Your Honor, this is

7  the matter of United States versus Khalat Alama,

8  Docket 4:05CR3019, matter comes on for hearing on

9  defendant's motion to suppress.

10                THE COURT:  Mr. Gooch, is the defense

11  ready to proceed?

12                MR. GOOCH:  We are, Your Honor.

13                THE COURT:  All right.  How many

14  witnesses do you have?

15                MS. FULLERTON:  One.

16                THE COURT:  Okay.  Do you wish to

17  make an opening statement?

18                MS. FULLERTON:  I would waive, Your

19  Honor.

20                MR. GOOCH:  May it please the Court,

21  at this time I would offer to stipulate that the

22  apartment that will be discussed in the testimony

23  is an apartment -- I believe the address is 526 A

24  Street in Lincoln, Lancaster County, State of

25  Nebraska, was leased to Khalat Alama and I

1   believe -- I'm not certain if Nicole Delgado was on

2   the lease, but I -- I am prepared to stipulate that

3   Mr. Alama's name was on the lease.  I offer that in

4   order to establish standing.

5       I don't believe the parties dispute, Your

6   Honor, that the entry was accomplished without a

7   warrant.  And as a consequence, assuming that the

8   government agrees with my stipulation concerning

9   standing, the burden then would shift to the

10   government to show an exception to the warrant

11   requirement.

12       We don't anticipate calling any witnesses,

13   unless the government doesn't agree to the

14   stipulation as to the standing issue.

15               MS. FULLERTON:  No, I stipulate it's

16   his apartment.

17               THE COURT:  That he's on the lease?

18               MS. FULLERTON:  Your Honor, I can't

19   stipulate that he's on the lease.  I haven't seen

20   the lease.  I do know however at least the

21   information provided to the police department was

22   that he was living at that apartment.

23               THE COURT:  All right.

24               MS. FULLERTON:  So I would stipulate

25   that he was living there.

1                      THE COURT:  That's fine.  Okay.  You

2    may call your first witness.

3                      MS. FULLERTON:  Government calls

4    Officer McAndrew.

5                      THE COURT:  Please come forward to

6    the clerk's desk to be sworn.

7                      THE CLERK:  Please state your full

8    name and spell your last name.

9                      THE WITNESS:  It's Kirk, K-I-R-K,

10   middle initial D, last name McAndrew, M-C, capital

11   A-N-D-R-E-W.

12                     THE CLERK:  Do you solemnly swear or

13   affirm that the testimony you are about to give

14   will be the truth to the best of your knowledge and

15   belief?

16                     THE WITNESS:  Yes.

17                     THE CLERK:  Please have a seat.

18                     THE COURT:  Go ahead.

19                          KIRK D. McANDREW,

20        Called as a witness, being duly sworn,

21   testified as follows:

22                     DIRECT EXAMINATION

23   BY MS. FULLERTON:

24   Q.   Sir, what is your current employment?

25   A.   I'm employed by the City of Lincoln Police

1    Department.

2    Q.    Okay.  And how long have you been with the

3    Lincoln Police Department?

4    A.    It's almost 19 years.

5    Q.    Okay.  And could you describe what your usual

6    job entails?

7    A.    At the present time I'm working with the

8    traffic unit, but my usual job when I'm not on that

9    assignment would be to just handle routine calls,

10   domestic fights, accidents, assaults, basic variety

11   of different things, loud parties.

12   Q.    Okay.

13   A.    Things of those natures.

14   Q.    Are you assigned to a particular area within

15   the city?

16   A.    At the present time just the City of Lincoln.

17   Q.    Okay.  And do you work in uniform?

18   A.    Yes, I do.

19   Q.    And do you drive a marked cruiser?

20   A.    It's a marked cruiser, the lights are in the

21   inside now.

22   Q.    Okay.

23   A.    But it is a marked cruiser.

24   Q.    But it's identified as a Lincoln Police

25   Department cruiser?

1    A.    Yes.

2    Q.    Okay.

3    A.    Uh-huh.

4    Q.    And were you so employed on January 11th of

5    2005?

6    A.    Yes, I was.

7    Q.    And on January 11th of 2005 did you get a

8    dispatch to contact Marcia Delgado?

9    A.    Yes, I did.

10   Q.    And what was -- what was the information you

11   got from dispatch about that call?

12   A.    It was just a -- some information about a

13   distressful-type phone call that she had received.

14   Q.    All right.  And so did you go have contact

15   with Marcia Delgado?

16   A.    Yes, I did.

17   Q.    Where did you go to contact her?

18   A.    1817 Sewell in Lincoln.

19   Q.    All right.  And did she report a phone call

20   that she had received to you?

21   A.    Yes.

22   Q.    And what kind of a phone call was that?  Was

23   it on a home phone?  A land line?

24   A.    It was a cell phone message.

25   Q.    A voicemail message?

1    A.    I -- I think on the cell phone there was a

2    message.

3    Q.    Okay.  And you got this dispatch on January

4    11, 2005; is that right?

5    A.    Yes.

6    Q.    Did Marcia Delgado indicate to you when this

7    call had been received?

8    A.    Yes.

9    Q.    What did she say?

10   A.    She said it was on 1/9 of '05.

11   Q.    January 9th of '05?

12   A.    Correct, uh-huh.

13   Q.    Okay.  And have you reviewed your report

14   regarding this matter before coming to court?

15   A.    Yes.

16   Q.    Was there an error in the date given by the

17   dispatcher?

18   A.    Correct.

19   Q.    And what was the error with respect to the

20   dispatcher?

21   A.    Well, I think that they had indicated that it

22   had happened much prior, which would've been

23   2/9 (sic) of '04.

24   Q.    12/9 of '04?

25   A.    Right.

```
 1    Q.    Okay.  But in talking to Ms. Delgado she told

 2    you it was two days before you talked to her?

 3    A.    That's correct.

 4    Q.    Okay.  Or approximately two days before?

 5    A.    Yeah, roughly, uh-huh.

 6    Q.    And did she have this call available for you

 7    to listen to?

 8    A.    Yes, she did.

 9    Q.    It was on her cell phone?

10    A.    Right.

11    Q.    And did she play the message for you?

12    A.    She did.

13    Q.    And what did you hear?

14              MR. GOOCH:  Excuse me, Your Honor,

15    object if it's being offered for the truth of the

16    matters asserted -- asserted.

17        If on the other hand it's to explain the

18    officer's actions, that's a different thing than

19    whether the words that were spoken are to be

20    accepted by the Court as true.

21              THE COURT:  What's your position?

22              MS. FULLERTON:  Well, my position is,

23    A, it's a suppression hearing so the rules of

24    evidence do not apply.  But it's not being offered

25    for the truth of the matter asserted.  It's being
```

1    offered to show why the officer did what he did.

2                    THE COURT:  The objection's

3    overruled.

4    Q.   (By Ms. Fullerton)  What did you hear, Officer

5    McAndrew?

6    A.   Well, I heard a couple shrill-type screams,

7    and then I heard someone -- a male voice come on

8    and say, I'm going to kill you.

9    Q.   Okay.  And did either of those voices identify

10   themselves on that particular recording?

11   A.   I don't believe they were identified by name.

12   Q.   The screams, did they appear -- did they sound

13   like a man or a woman?

14   A.   It was -- sounded like a woman to me.

15   Q.   Was there any -- was there any notation on the

16   recording as to when that call was made?

17   A.   There was no date mentioned on the message.

18   Q.   It was not the type that has a time and a date

19   message stamp on it?

20   A.   No, I don't believe there was -- there was

21   anything to indicate that.

22   Q.   Okay.  Did Marcia Delgado tell you when she

23   believed she got that call?

24   A.   She said she got it a couple days prior.

25   Q.   On January 9th?

1    A.    Right.

2    Q.    And did she say approximately when?

3    A.    I can't -- I can't remember -- I don't know

4    exactly when that was.

5    Q.    Okay.  Now, after you listened -- when you

6    heard this call, did you try and record that?

7    A.    I did.

8    Q.    And do you still have that recording?

9    A.    I do not.

10   Q.    Do you know what happened to that recording?

11   A.    I'm not sure what happened to the recording.

12   Q.    And as far as we know it wasn't tagged into

13   property; is that correct?

14   A.    As far as we know it was not.

15   Q.    Okay.  In talking with Marcia Delgado did she

16   give you an idea as to who she thought was involved

17   in this call?

18   A.    Yes.

19   Q.    And who did she tell you was involved?

20   A.    She thought it was her niece, Nicole

21   Delgado --

22   Q.    Okay.

23   A.    -- was the one that was screaming.  And she

24   also referred, I think, to the other person

25   involved as being Khalat Amad or Amad, something of

1    that nature.

2    Q.   First name was Khalat?

3    A.   That's correct.

4    Q.   And after you got this information from Marcia

5    Delgado and had listened to the tape -- or not the

6    tape, the record -- the cell phone message, what

7    did you do then?

8    A.   I tried to find out where Nicole Delgado would

9    be at so I could check her welfare to make sure she

10   was okay.

11   Q.   And how did you go about doing that?

12   A.   I either received information from the lady

13   I'd spoken with, or through our intelligence at the

14   police department --

15   Q.   Okay.

16   A.   -- and obtained an address.

17   Q.   So you got an address?

18   A.   I did.

19   Q.   But you're not sure whether it came from

20   Marcia Delgado or from the police department

21   records?

22   A.   I'm not positive.

23   Q.   At any rate, was there an address that you

24   went to to follow up on this?

25   A.   Yes.

1    Q.    And what address was that?

2    A.    526 A, as in Adam, number A.

3    Q.    Okay.  In Lincoln?

4    A.    Or letter A, rather.  Yes.

5    Q.    And what kind of a -- what kind of a -- is

6    that a residence?

7    A.    It's actually a -- I believe a duplex.  I

8    believe there's just two units there.  A duplex or

9    a triplex.

10   Q.    Okay.

11   A.    More than one dwelling there.

12   Q.    And did any other officers initially go to

13   that residence with you?

14   A.    Yes.

15   Q.    Who went with you?

16   A.    Officer Hruza.

17   Q.    Officer Hruza.  And what did you and Officer

18   Hruza do when you got to 526 A Street?

19   A.    We tried to get contact at the residence to

20   contact the people that were living there.

21   Q.    And how did you do that?

22   A.    I believe we knocked on the doors and tried to

23   get someone to come to the door, no one ever did.

24   Q.    Nobody answered?

25   A.    No.

1    Q.    And at 5 -- this particular duplex, is it

2    ground level?  Two level?  What kind of a --

3    A.    It's -- it's a -- I guess I can describe it as

4    a ground level.  There's a front side to the

5    duplex, which faces south towards A Street.  And

6    the area that we were concerned about would've been

7    the back side portion on the west side.

8    Q.    Okay.  Does the front side have a driveway

9    that goes out to A Street?

10   A.    I don't believe that it does.

11   Q.    Okay.

12   A.    I don't believe there's any parking on the A

13   Street side, but there is a parking lot in the

14   back.

15   Q.    Is there an alley back there?

16   A.    Yes.

17   Q.    So there's a parking lot between the building

18   itself and the alley?

19   A.    That's correct.

20   Q.    Okay.  Were there any cars parked in the

21   parking lot behind the building?

22   A.    There -- during the course of the

23   investigation there was a Nebraska-plated white

24   Cadillac, and letters, numbers, being OPG745.

25   Q.    Okay.  Now after you and Officer Hruza tried

1    to make contact at 526 A, number A, and were

2    unsuccessful, what did you do then?

3    A.    I contacted Sergeant Heermann with Lincoln

4    Police Department.

5    Q.    Okay.  Did you go to the police department or

6    did you do that on the radio?

7    A.    We had contact eventually at the police

8    department.  I was concerned that, you know, that

9    we didn't make our contact to make sure this Nicole

10   Delgado was okay.

11   Q.    All right.  And did you ask for or receive any

12   additional records with respect to Nicole Delagdo

13   and a person with the first name of Khalat during

14   your investigation?

15   A.    I received some information about a prior

16   domestic assault --

17   Q.    Okay.

18   A.    -- that occurred back in 2004.

19   Q.    Or that had been reported in 2004?

20   A.    That's correct.

21   Q.    Okay.  Involving the two of them?

22   A.    Yes, Mr. Alama and Nicole Delgado, excuse me.

23   Q.    Okay.  And how much information did you

24   receive about his prior assault report?

25   A.    I just had information that -- the case number

1   and I believe also that I had information that he

2   was cited for domestic assault on her.

3   Q.   Okay.  And have -- when you -- going back to

4   when you were first at 526 A Street --

5   A.   Uh-huh.

6   Q.   -- you tried to make contact at apartment

7   number A; is that right?

8   A.   Yeah, it -- like I said, I believe it was

9   apartment A or it's just 526.  But it is on the

10  west side.

11  Q.   Okay.  The west side.  And did you try and

12  contact any of the neighbors in that area?

13  A.   I did.

14  Q.   And who did you try and contact?

15  A.   I contacted a Linda Barb.

16  Q.   And where did Linda Barb live?

17  A.   Linda Barb lives at the address of 528 A

18  Street, I believe.  Actually, it's on the front

19  side of the complex there.  It's off the porch

20  area.  The front porch area is where she lives.

21  Q.   The A Street side?

22  A.   Correct.

23  Q.   And does that -- does her residence share a

24  wall or something with -- with -- with the one

25  where Nicole Delgado and Khalat Alama were expected

1     to be?

2     A.    Yes.

3     Q.    Okay.  And did you talk to her?

4     A.    I did.

5     Q.    And did she give you any information about the

6     persons who lived in the apartment on the -- part

7     of the duplex on the back side?

8     A.    Yes, she did.

9     Q.    What information did she give you?

10    A.    Well, she indicated there hadn't been too much

11    problems, but there was some problems with loud

12    music and -- as well as she had indicated that if

13    the car was in the back that Mr. Alama would be

14    there and as well as the female.

15    Q.    So she told you in essence if the car's there

16    he's there?

17    A.    Yes.

18    Q.    And what did she say about Ms. Delgado, about

19    whether or not she would leave the residence?

20    A.    She said that she never leaves the residence,

21    she said.

22    Q.    Did you also try and contact the owner of the

23    building?

24    A.    I did.

25    Q.    And how did you find out who the owner of the

1    building was?

2    A.    I believe it would've been through Linda Barb.

3    And I was unable to get a hold of the owner of the

4    building.

5    Q.    Okay.  After you had acquired the information

6    from Marcia Delgado, listened to the tape, talked

7    to Linda Barb, attempted to contact Nicole Delgado

8    at the apartment, and learned about the prior

9    report of an assault, did you have some additional

10   conversation with other officers?

11   A.    Yes, I did.

12   Q.    And who was involved in that conversation?

13   A.    Captain Thoms, and I believe also that

14   Sergeant Heermann would've been present at that

15   time too.

16   Q.    Okay.  And was there a determination made as

17   to what should be done as a result of the

18   information you'd obtained?

19   A.    Yes.  The captain's opinion was that we needed

20   to really try to make contact with this person to

21   make sure she was okay.

22   Q.    Okay.  And was any attempt made to call on the

23   telephone to this residence?

24   A.    I don't believe -- I -- I don't know whether

25   we had phone contact or tried phone contact.  But

1    it is a part of our procedure, we would normally

2    try to make phone contact and not make any entry to

3    any place unless absolutely necessary to do so.

4    Q.   Okay.  So it would be part of your normal

5    procedure to do that?

6    A.   Absolutely.

7    Q.   Do you know for sure whether it was done in

8    this case?

9    A.   I -- I -- I don't recall.

10   Q.   Okay.

11   A.   I do know that we present a risk to ourselves

12   if we enter a situation like that without --

13                  MR. GOOCH:  I'm going to object to

14   this as volunteered.  It's not responsive to the

15   question.

16                  THE COURT:  Sustained.

17   Q.   (By Ms. Fullerton)  Okay.  At any rate, as far

18   as you know there wasn't any phone contact?

19   A.   I -- there would not have been any phone

20   contact with the residence.

21   Q.   Okay.  So then what did you do?

22   A.   I -- Sergeant Heermann and myself as well as

23   Officer Muff who had a lock pick type of set did go

24   to the address to try to make contact there.

25   Q.   Okay.  Did you try knocking again?

 1   A.    I believe we did.

 2   Q.    Did anybody respond?

 3   A.    No.  No one responded.

 4   Q.    Okay.  And so then what did you do?

 5   A.    We were going to make entry via the lock pick

 6   set, but there was a piece of cardboard or board

 7   over the west side window that allowed access

 8   without using the lock pick set.

 9   Q.    Okay.  So you were able to reach in and unlock

10   the door?

11   A.    That's correct.

12   Q.    And did you then go into the residence?

13   A.    Yes, we did.

14   Q.    And what was your reason for going into the

15   residence?

16   A.    To check on the welfare of Nicole Delgado.

17   Q.    And what happened when you went into the

18   residence?

19   A.    We went into the residence through the west

20   side and into the living room area and no one was

21   there.  And then we went into the east side bedroom

22   and there was a couple people underneath the

23   covers.

24   Q.    And who were those people?

25   A.    Khalat Alama and Nicole Delgado.

1    Q.    And at that point did you and the other

2    officers separate the two of them to find out what

3    was going on?

4    A.    Yes.

5    Q.    And what did you do?

6    A.    I had Nicole Delgado step into the living

7    room, to investigate whether she had been assaulted

8    or what the situation was.

9    Q.    Okay.  And did you have a conversation with

10   her?

11   A.    I did.

12   Q.    And did you play the tape for her?

13   A.    I don't remember whether I did or not.

14   Q.    Or talk to her about the tape recording?

15   A.    I talked to her, most likely, about why we

16   were there; that we were concerned about her.

17   Q.    Okay.  And she denied there being any problem;

18   is that --

19   A.    That's correct.

20   Q.    In the process of taking her into the living

21   room to find out what was going on or if anything

22   had happened, did you notice anything in the living

23   room as -- as you were going to talk to Nicole

24   Delgado?

25   A.    I did.

1    Q.    What did you notice?

2    A.    I noticed that on the coffee table that there

3    was a broken vase and it looked like it had been

4    burnt.  As well as I noticed a clear baggie-type of

5    envelope that was probably about an inch-and-a-half

6    by inch, somewhere around there, that had some

7    white -- whitish crystal substance in it.

8    Q.    And where was that located?

9    A.    I believe all on the coffee table.

10   Q.    Okay.  And was this where you had gone to talk

11   to Nicole?

12   A.    That's where she was led into, yes.

13   Q.    And at some point in your discussion with her

14   about the situation, did she try and cover that up?

15   A.    I don't remember whether she did or not.  If I

16   can review my report --

17   Q.    If you can refer to the last page.

18   A.    Okay.  Yes, it would appear from the report

19   that she tried to cover it up with a checkbook

20   cover or something over the top of the transparent

21   baggie.

22   Q.    But you'd already seen it at that point?

23   A.    Yes.

24   Q.    And did you seize the -- seize those items?

25   A.    We did.  I believe at that point we'd already

1    seen that, and I -- I'd made notice of her hand

2    manipulations.

3                    THE COURT:  And what?  I'm sorry.

4                    THE WITNESS:  I'd been -- noticed her

5    manipulations with her hands as far as the

6    checkbook cover.

7    Q.    (By Ms. Fullerton)  But you had seen the bag

8    prior to her --

9    A.    I believe -- I believe we did.

10   Q.    -- doing that?

11   A.    Yes.

12                   MS. FULLERTON:  Your Honor, I would

13   inquire if the Court has the two exhibits I

14   submitted?

15                   THE COURT:  Yes.

16                   MS. FULLERTON:  May I approach?

17                   THE COURT:  Please come forward.

18   Q.    (By Ms. Fullerton)  Officer McAndrew, I've

19   handed you what has been marked Exhibits A and B.

20   Do you recognize what's shown in those items?

21   A.    Yes, I do.

22   Q.    And what is shown in Exhibits A and B?

23   A.    In Exhibit A it appears to be the same baggie

24   that had the white crystal substance in it that I

25   confiscated from the scene at 526 A.

1          And Exhibit B appears to be the burnt broken

2     vase that was also confiscated from 526 B (sic)

3     Street.

4     Q.   And are those photos of those items that

5     are -- that are contained in property that I asked

6     you to have taken prior to the hearing in this

7     case?

8     A.   Yes.

9               MS. FULLERTON:   I'd offer Exhibits A

10    and B.

11              MR. GOOCH:   No objection.

12              THE COURT:   Received.

13    Q.   (By Ms. Fullerton)   While you were talking to

14    Nicole Delgado in the living room, was -- did

15    Officer Muff stay with Khalat Alama in the bedroom?

16    A.   I believe he did.

17    Q.   And to your knowledge did Khalat Alama tell

18    Officer Muff that he lived at that apartment?

19    A.   I believe he did.

20              MS. FULLERTON:   Just a moment, Your

21    Honor.

22    Q.   (By Ms. Fullerton)   At any time during this

23    investigation were you seeking to find drugs?

24    A.   No.

25    Q.   Were you seeking information on the welfare of

1    Nicole Delgado?

2    A.    I was.

3              MS. FULLERTON:   No further questions.

4              THE COURT:   All right.

5    Cross-examination.

6              MR. GOOCH:   Thank you.

7                   CROSS-EXAMINATION

8    BY MR. GOOCH:

9    Q.    Sir, is it correct that you received the

10   dispatch about 11:22 on the morning of January 11,

11   2005?

12   A.    Yes.

13   Q.    And I've noticed during your testimony, sir,

14   that you've been looking down.  Do you have the

15   report right in front of you?

16   A.    I have some reports, correct.

17   Q.    Would you please tell us when it is you're

18   reading from a report as opposed to your specific

19   recollection?  It's just easier to know when you

20   remember specifically or when you're using the

21   report to get the information.  Will you help us

22   with that, please?

23   A.    I guess I don't understand the question.

24   Q.    Okay.  As I ask you questions, if you don't

25   remember, will you tell me -- I'm not going to

1    resist letting you look at the report, I just want

2    to know when you do.  Does that make sense?

3    A.    I -- I can tell you that if you want.

4    Q.    Okay.  So you got the report at about 11:20 in

5    the morning?

6    A.    It would've been about 11:22.

7    Q.    11:22?

8    A.    Uh-huh.

9    Q.    And January the 11th was a Tuesday?

10   A.    I don't recall what day it was.

11   Q.    It was the middle of the week?

12   A.    I -- I don't recall.

13   Q.    Was it a weekday?

14   A.    I worked -- if I can expand a little bit, I

15   believe at that time I worked Sunday, Mondays off.

16   So I probably wouldn't have been on either of those

17   days.  But I don't recall exactly what day.

18   Q.    Okay.  And you work dayshift?

19   A.    I did, correct.

20   Q.    At that time?

21   A.    Correct, sir.

22   Q.    When you got the dispatch you drove directly

23   to Marcia Delgado's residence?

24   A.    I drove to her residence.

25   Q.    And then you spent some time interviewing

1    Marcia Delgado.

2    A.   I did.

3    Q.   Then you drove directly to 526 A Street?

4    A.   I don't know whether I'd describe it as

5    directly.  I do know that we did some investigation

6    to try to determine, you know, where the address

7    was, I believe, and --

8    Q.   Now, whether you got the address from Marcia

9    Delgado or from some other source, as soon as you

10   got that then you went to that address?

11   A.   I didn't go to that address right --

12   Q.   At the time you first went to the 526 A Street

13   address, had you already acquired the information

14   that there had been a report of a prior domestic

15   assault between Khalat Alama and Nicole Delgado?

16   A.   I don't -- I don't remember.

17   Q.   So it's possible the first time you went out

18   there you didn't possess that information?

19   A.   Yeah, I -- I really don't remember whether I

20   did at that time or not, sir.

21   Q.   What time did you leave Marcia Delgado's

22   residence after interviewing her?

23   A.   I don't know what the exact time was.  It was

24   after I interviewed her and acquired the

25   information, I thought it was necessary that I

1  left.

2  Q.   Was Officer Hruza in the same vehicle you were

3  in, or did you meet at 526 A Street?

4  A.   We would have met.   We drive separate

5  cruisers.

6  Q.   And when you got there you knocked on the

7  door?

8  A.   We did.

9  Q.   Did you do the knocking?

10  A.   I -- I may have.   Officer Hruza may have also.

11  We tried to get a contact with the resident there

12  to check on the welfare.

13  Q.   And you got no answer.

14  A.   No answer.

15  Q.   Did you shout, police department, come to the

16  door, something?

17  A.   I don't -- I don't remember.   We didn't get a

18  response with loud knocks.   Whether we actually

19  announced ourselves as police officers, I'm not

20  sure.

21  Q.   Didn't hear any noise from inside the

22  apartment?

23  A.   I don't recall any noise.

24  Q.   Didn't see any movement inside the apartment?

25  A.   I don't recall any movement.

1    Q.    Then you made observations about the Cadillac

2    that was parked behind the -- the house?

3    A.    Whether the Cadillac was parked there or when

4    we came back the second time, I'm not sure.  But

5    the Cadillac was observed there.

6    Q.    Would reviewing your report help you draw your

7    attention, sir, to lines 78 through 84?

8    A.    It would appear the first time that we went

9    there was -- the Cadillac was there.

10   Q.    Now, having reviewed the report, does that

11   refresh your recollection of that detail or are you

12   just trusting the report?

13   A.    Well, as I investigated the matter, I did make

14   a report.  And I -- there was a white Cadillac

15   parked there.  This helps me realize that it was

16   there the first time.

17   Q.    Okay.  The first time you were there is also

18   the time you talked to the neighbor, this Linda

19   Barb?

20   A.    I don't know whether we -- I talked with her

21   immediately or whether that would've been later.

22   Q.    You made two trips to 526 A Street?

23   A.    We did.

24   Q.    The first trip would've included a

25   conversation with Linda Barb?

1    A.    I don't know.

2    Q.    Okay.  Then as I understand it you went back

3    to the police station?

4    A.    We did.

5    Q.    Okay.  Did Investigator Hruza go with you back

6    to the police station?

7    A.    I don't know whether Officer Hruza did or not.

8    I know that I met with Sergeant Heermann because I

9    was concerned about the situation.

10   Q.    Okay.  Do you recall what time you -- the

11   first time you got to 526 A Street, what time you

12   arrived?

13   A.    It would've been after 11:22 because I took

14   the initial report down.

15   Q.    How much after?

16   A.    I -- I really don't know.  Hour or less

17   probably.

18   Q.    And how long knocking on the door and talking

19   to the neighbors or looking at the parking lot or

20   those kinds of things?

21   A.    I -- I don't know how much time we spent

22   there.  We ascertained that we were not going to

23   get contact at that time, that no one was going to

24   answer the door there.

25   Q.    But you can't tell us today how long you spent

1    checking the situation out before you left.

2    A.    No.

3    Q.    And when you left, you went back to the police

4    station?

5    A.    Eventually we went back to the police station

6    then I contacted Sergeant Heermann, we had some

7    concerns about the situation.

8    Q.    Okay.  So you were --

9              THE COURT:  You had some -- I'm

10   sorry, I didn't hear you.  We had some --

11             THE WITNESS:  We had some concerns

12   about the situation.

13   Q.    (By Mr. Gooch)  Okay.  So you went back to the

14   police station.  Did you contact Sergeant Heermann

15   before you left 526 A, or after you got to the

16   police station?

17   A.    I don't know where I contacted her at.  It

18   would either have been at the scene or back at the

19   station.

20   Q.    But you don't know which?

21   A.    I -- eventually we were back at the station.

22   I do know that.  Because we had a conversation with

23   Captain Thoms.

24   Q.    And how long were you at the police station

25   before you then went back out to 526 A Street?

1   A.   I don't know exactly.

2   Q.   What time was it when you got back to 526 A?

3   This would've been the second time you were there.

4   A.   Second time we were there I think probably

5   would've definitely been prior to 4:00.

6   Q.   But how much before 4:00?

7   A.   I don't know for sure.  It would've been -- I

8   could estimate that it probably would've been

9   within a couple hours of the original incident.

10  Q.   But you actually don't know?

11  A.   I don't know for -- for sure.

12  Q.   And that's not something you made a note of in

13  your report, the times?

14  A.   It doesn't appear.

15  Q.   I'm sorry?

16  A.   It doesn't appear that there was a note made

17  on that.

18  Q.   And you don't remember positively whether you

19  obtained a telephone number or made a call inside

20  of the Alama/Nicole Delgado residence?

21  A.   I -- I don't know, I --

22  Q.   That would be your normal practice.

23  A.   It would be.

24  Q.   But you don't specifically remember in this

25  case --

1    A.    I don't specifically say here.

2    Q.    And you didn't make a note of that in your

3    report either.

4    A.    I did not.

5    Q.    When you went back out to 526 A Street, it's

6    correct that Sergeant Heermann went out there.

7    A.    She was there.

8    Q.    And Officer Muff was called to meet you there.

9    A.    That's correct.  He actually -- I believe we

10   contacted him in the police station and he assisted

11   us by going out because he had a lock pick set.

12   Q.    Okay.  So there were three officers that went

13   out the second time.

14   A.    That's correct.

15   Q.    And when you got out there the second time,

16   again there was a knock on the door?

17   A.    I believe that we also knocked on the door,

18   got no answer.

19   Q.    Do you specifically remember that second time

20   knocking on the door?

21   A.    I would say I don't specifically remember, but

22   we would not have made entry if I didn't try to get

23   someone to come to the door.  It's just not the --

24   the procedure that we would use.  We could -- there

25   would be no reason for us to -- if someone came to

1    the door, to use the lock pick or to reach inside

2    and unlock the door.

3    Q.   And again as far as you can recall, no noise

4    or anything from inside the premises the second

5    time that you're at 526 A Street?

6    A.   That'd be correct.

7    Q.   And you don't remember for sure whether your

8    conversations with Linda Barb were part of the

9    first time you were out there or the second time

10   you were out there?

11   A.   I contacted her some time during the course of

12   the investigation, and she had given me information

13   about the landlord.  I tried to contact the

14   landlord and was unsuccessful.

15   Q.   But your conversation with Linda Barb was face

16   to face?

17   A.   It was.  I talked with her.

18   Q.   So -- so this wasn't a contact that you made

19   by telephone, it was a contact face to face?

20   A.   I contacted her directly.

21   Q.   That could've been the second time you were

22   out there?

23   A.   I don't know, sir.  During the course of the

24   investigation.

25   Q.   Okay.  Sir, the door that had the cardboard

1    over a portion of the door, that was an exterior

2    door?

3    A.    Yes.

4    Q.    And by pushing the cardboard aside you were

5    able to reach inside and unlock the door?

6    A.    That's correct.

7    Q.    And that was the reason that Officer Muff did

8    not need to use the lock pick kit?

9    A.    That's correct.

10   Q.    And once that door was unlocked you were able

11   to open that door and gain entry into the entire

12   premises?

13   A.    As far as we could tell, the -- we walked into

14   what would be the living room area and then into

15   the bedroom area, which was to the east of there.

16              THE COURT:   Which is what?

17              THE WITNESS:   I'm sorry.  To the east

18   of there.

19   Q.    (By Mr. Gooch)  And you saw no one in the

20   living room, walked into the bedroom and saw two

21   people under the covers -- or saw people under the

22   covers in the bedroom?

23   A.    They were hidden under the covers.

24   Q.    Hidden under the covers?

25   A.    Correct.

1    Q.    So you didn't see them when you walked into

2    the room.   You just saw shapes of people under the

3    covers.

4    A.    I believe Officer Muff was the one that

5    discovered them under the covers.

6    Q.    Did you see them under the covers?

7    A.    I did.   I did.

8    Q.    And were they doing something under the

9    covers?

10   A.    Were they doing something under the covers?

11   It appeared that they were hiding because the

12   covers were over the top of their heads.

13   Q.    But the covers were moving around, like they

14   were --

15   A.    I -- I -- there again, I don't know.   We

16   speculated by looking, I believe, that there was

17   people underneath the covers.

18   Q.    But it -- but they weren't actively involved

19   in some kind of behavior under the covers.

20   A.    I don't know what they were doing under the

21   covers.

22   Q.    I'm sorry.   Been around the block four times

23   now.   Were the covers moving when you saw the

24   covers?

25   A.    I -- I don't know, sir.

1    Q.    You don't know because you didn't see them, or

2    because you don't remember?

3    A.    I don't know whether they were moving or not.

4    Q.    When the people came out from under the

5    covers, did they come out at your direction?  Did

6    one of the three of you say, come out from under

7    the covers?

8    A.    I don't know whether that happened or whether

9    someone actually took the cover from atop the

10   people to make a contact with them.

11   Q.    And how was Mr. Alama dressed?

12   A.    I don't recall.

13   Q.    How was Ms. Delgado dressed?

14   A.    I believe she was clothed, because she came

15   out into the living room.

16   Q.    Wearing shoes?

17   A.    I don't know what kind of shoes or whether she

18   had shoes on or not.

19   Q.    At that point is when the two people were

20   separated; is that right?

21   A.    That's correct.

22   Q.    And was that at your direction, or did

23   Sergeant Heermann say, you take her in there?  How

24   did that --

25   A.    I don't --

1    Q.    Who made those decisions?

2    A.    I don't recall.

3    Q.    When you were talking to Ms. Delgado you

4    talked to her about the telephone call?

5    A.    I talked with her about why we were there, and

6    I probably specifically mentioned the phone call

7    and our concerns about her welfare.

8              MS. FULLERTON:   Excuse me, I assume

9    we're referring to Nicole Delgado?  We talked about

10   Marcia Delgado earlier.

11             MR. GOOCH:   I beg your pardon.  Yes.

12   Q.    (By Mr. Gooch)  We are talking about Nicole

13   Delgado, right?

14   A.    Nicole.  She's the one we had contact with,

15   yes.  I'm sorry.

16   Q.    At 526 A Street?

17   A.    Correct.

18   Q.    And when you asked her about the phone call,

19   she said there was no problem.

20   A.    She said there was not a problem.

21   Q.    Did she provide an explanation for the

22   screaming on the telephone?

23   A.    She said -- yeah, she did say something.

24   Q.    An explanation that you were satisfied with?

25   A.    Her explanation satisfied me that there was no

1     problem.

2     Q.     During your conversation, that's when you

3     first noticed the things in the living room?  That

4     is, your conversation with Nicole Delgado?

5     A.     Either that, or as we walked in our -- our

6     main focus when we went in was to make sure that

7     everything was okay with Nicole Delgado.

8     Q.     Do you remember when you made observations of

9     either the baggie or the burnt broken vase in the

10    living room?

11    A.     It would've either been as I walked in or as

12    we came back in the living room.

13    Q.     Do you know which of those it was?

14    A.     I think that it was probably when I first

15    walked in.

16    Q.     You told us that some time before your second

17    trip to 526 A Street you had learned that there had

18    been a prior report of a domestic assault in 2004?

19    A.     That's correct.

20    Q.     Were you, at the time you learned that,

21    provided the date on which that report was made?

22    A.     I don't know.  I know it had a -- excuse me --

23    it had an A4 case, which would've been 2004.  Our

24    cases go by A4 or A5, et cetera, for different

25    years.  So it would've been in 2004.

1    Q.    But beyond that, you don't recall specifically

2    knowing when during the year 2004 that report was

3    made?

4    A.    I -- I don't recall that.

5    Q.    And is it correct that you don't know whether

6    that report resulted in a prosecution?

7    A.    I believe -- yeah, I don't know whether he was

8    prosecuted, but he was cited for domestic assault,

9    my understanding.

10   Q.    Did you also check to see whether or not there

11   was a protection order between these two parties?

12   A.    I may have, but I don't recall whether I did

13   or not.

14   Q.    And finally when you interviewed Linda Barb --

15   whenever that was, either the first time or the

16   second time, when you interviewed Linda Barb she

17   told you she really had no problems with her

18   neighbors other than occasional loud music --

19   A.    Yes.

20   Q.    -- is that right?

21   A.    That's what she said, uh-huh.

22   Q.    During your two trips to 526 A Street, did you

23   ever put your hands on the Cadillac to see whether

24   or not it was warm, an indication that it had been

25   operated recently?

1    A.    I don't recall doing that.

2    Q.    Do you recall the weather for January the

3    11th, 2005?

4    A.    I don't recall it exactly, no.

5              MR. GOOCH:   That's all the questions

6    I have of this witness.

7              THE COURT:   All right.   Redirect?

8                    REDIRECT EXAMINATION

9    BY MS. FULLERTON:

10   Q.    Officer McAndrew, when you went to 526 A

11   Street the second time with Sergeant Heermann and

12   Officer Muff, did you feel that by the -- at the

13   point that you entered the apartment that's -- on

14   that second occasion, did you feel that you had

15   exhausted all the things you could to try and find

16   out what was going on inside there, short of going

17   into the apartment?

18   A.    That's correct.

19   Q.    Did you know of anything else you could do at

20   that point to try and find out the welfare of

21   Nicole Delgado without going into the apartment?

22   A.    No.

23   Q.    And at the time you entered the apartment,

24   were you concerned for her welfare based on the

25   information you'd obtained up to that time?

1    A.    Yes.

2    Q.    Did you enter the apartment for any other

3    reason?

4    A.    Just to check her welfare.

5                 MS. FULLERTON:  I have no further

6    questions.

7                 THE COURT:  All right.  I want to

8    clarify just one thing, perhaps I wasn't writing

9    correctly.

10        What was your reason for leaving 526 A Street

11   when you did the first time?

12                THE WITNESS:  Basically to consult

13   with our sergeant, to see what we -- how we would

14   proceed with it.  And in discussing that with her

15   and listening to the tape, it was -- she had a

16   concern that we needed to make contact to make sure

17   the gal was okay.

18                THE COURT:  "She" being?

19                THE WITNESS:  Sergeant Heermann.

20                THE COURT:  Okay.  And could you --

21   well, did you try to contact her while you were

22   still at the address of the apartment?

23                THE WITNESS:  Did I contact the

24   supervisor there, sir?

25                THE COURT:  Sergeant Heermann.

1                     THE WITNESS:  Sergeant Heermann.  I

2     don't know whether I contacted her there or whether

3     we met over at the -- the police station.

4                     THE COURT:  Okay.  Well, why did you

5     leave?

6                     THE WITNESS:  Why did I leave?

7                     THE COURT:  Uh-huh.

8                     THE DEFENDANT:  I exhausted what I

9     could do at that point.  I didn't know what else I

10    could do to make a contact there and wanted to

11    consult with the supervisor to get some advice.

12                    THE COURT:  And you -- I -- I guess I

13    still don't understand why you couldn't have done

14    that by radio or telephone from where you were at

15    the apartment.

16                    THE WITNESS:  I -- I probably

17    could've.  I -- I didn't.  We ended up going to the

18    police station.  And we also contacted the -- the

19    police captain while we were there to inform him of

20    what the situation was.

21                    THE COURT:  And how long were you at

22    the police station before you returned?

23                    THE WITNESS:  I don't know exactly.

24    I -- I don't know for sure.  I mean, it wasn't an

25    extended period of time, but long enough to contact

1    the supervisor and the captain and try to figure

2    out how we could proceed with this.

3              THE COURT:  Do you recall all of the

4    things that you did at the police station?

5              THE WITNESS:  I probably -- I would

6    think that I checked the -- the police computer to

7    see, you know, if there had been any contacts and

8    to try to investigate that to see if we had any

9    information about the case that I wasn't aware

10   of --

11             THE COURT:  And how long --

12             THE WITNESS:  -- computer

13   intelligence.

14             THE COURT:  -- did that take you?

15             THE WITNESS:  I don't know for sure.

16   I -- I would have to estimate that we were maybe

17   there 20 minutes or -- or 20, 25 minutes.

18             THE COURT:  How long was your

19   conversation with Sergeant Heermann?

20             THE WITNESS:  Well, from the point

21   that we had first contact until the point that we

22   made contact back at the residence, I think would

23   be included in that timeframe.

24             THE COURT:  No, I'm -- I'm just

25   talking about at the police station.  How long was

1    your conversation with her?

2                    THE WITNESS:  I -- it would've -- I

3    don't know how long the conversation was.  It

4    would've been within 25 -- probably 20 or 25

5    minutes to the time that we contacted her there and

6    whatnot.

7                    THE COURT:  And then you said you

8    also conferred with a captain.

9                    THE WITNESS:  That's correct.

10                   THE COURT:  Who was that?

11                   THE WITNESS:  Captain Thoms.

12                   THE COURT:  And was that in person at

13   the station?

14                   THE WITNESS:  That was at the police

15   station.

16                   THE COURT:  Okay.  Was he on duty, I

17   take it?

18                   THE WITNESS:  Yes.

19                   THE COURT:  You -- you didn't have to

20   call him there, right?

21                   THE WITNESS:  No, sir.

22                   THE COURT:  Okay.  How long was your

23   conversation with him?

24                   THE WITNESS:  It was brief.  We

25   played the tape for him and he had indicated that

1    we should do something to try to contact this lady.

2                    THE COURT:  That's all the questions

3    I have.

4        Are there questions on my questions, Ms.

5    Fullerton?

6                    MS. FULLERTON:  I think just one,

7    Your Honor.

8                    FURTHER REDIRECT EXAMINATION

9    BY MS. FULLERTON:

10   Q.   Officer McAndrew, the first time that you were

11   at 526 A you were by yourself; is that right?

12   A.   I went with Officer Hruza.

13   Q.   With Hruza.  Okay.

14       And according to police department procedure

15   if you were going to make entrance to the apartment

16   the first time you were there, would you have

17   needed a supervisor to be on site before that

18   happened?

19   A.   Not in an -- not in a situation where it's an

20   emergency situation.

21   Q.   But you would have to have contact --

22   A.   I -- I would contact her for permission to --

23   Q.   You'd have to get the -- the supervisor's

24   permission prior to doing that.

25   A.   That's correct.

1          MS. FULLERTON:  I don't have any

2     other questions.

3               THE COURT:  All right.  Mr. Gooch?

4               MR. GOOCH:  No questions.

5               THE COURT:  You may step down.

6               THE WITNESS:  Thank you, sir.

7               MS. FULLERTON:  No further evidence,

8     Your Honor.

9               THE COURT:  All right.

10              MR. GOOCH:  Your Honor, I would ask

11    the Court to take judicial notice that January the

12    11th, 2005 is a Tuesday -- or was a Tuesday.

13              THE COURT:  I have a calendar.  It

14    was.  Granted.  Anything else?

15              MR. GOOCH:  No.

16              THE COURT:  And nothing by way of

17    additional evidence then, right?

18              MR. GOOCH:  Correct.

19              THE COURT:  Okay.  I'll hear your

20    arguments.  Ms. Fullerton.

21              MS. FULLERTON:  Your Honor, I've made

22    most of my arguments in my brief.  I guess my

23    thought is in this case in terms of -- of -- I know

24    Mr. Gooch is going to say it wasn't exigent

25    circumstances, but I guess the question is, what

1   else was the officer supposed to do at this point?

2       He had information with respect to this tape

3   that appeared to have someone screaming on it and

4   somebody saying, I'm going to kill you.  Concerns

5   expressed by the aunt of the -- the supposed

6   victim, for her welfare.

7       He checks out the place, nobody answers the

8   door.  He's informed at least at some point by the

9   neighbor that if the car -- the white Cadillac,

10  is -- is there, then the -- the male resident is

11  home, and the female resident is always home.  So

12  he has reason to believe there's somebody in there,

13  even though he can't get anybody to come to the

14  door.

15      At some point in the course of the

16  investigation he also becomes aware that there was

17  a prior report of an assault which -- involving

18  these two parties, which had happened within the

19  prior year, and which involved a citation at least

20  having been issued to Khalat Alama.

21      And all the efforts made by the officers to

22  make contact at this residence were unsuccessful,

23  even though the -- here that the parties were

24  there.  And he didn't know of anything else he

25  could've done other than enter to find out her

 1    welfare.

 2         One of the things that police officers are

 3    supposed to do is protect the public.  And if

 4    they're not allowed to go in and protect the public

 5    in a situation where they have no other

 6    alternative, then I don't know what they're here

 7    for.

 8         And while this might not be the most exigent

 9    of exigent circumstances, the case that I cited to

10    you in the brief, the -- it's the Janis case, that

11    was the one where the Eighth Circuit said it was

12    exigent circumstances to go into a house looking

13    for a gun after a person had been -- had apparently

14    shot himself in the resident -- in the residence

15    and the other person who was in the residence had

16    given them permission -- the officers permission to

17    go back in and get the gun.  The person who shot

18    himself didn't want them to go back in and get the

19    gun.

20         And the Eighth Circuit said that it was

21    exigent circumstances for the officers to go back

22    into a residence, which at that point at least

23    given the facts that are set out, as far as we can

24    tell in the case there was no reason to believe

25    there was anybody in the residence in imminent

1    danger of this loaded gun -- which of course

2    certainly could be a danger to somebody at some

3    point -- but there was no indication that there was

4    anybody in the residence.

5         And they said it was still exigent

6    circumstances for the police officers to go in and

7    get a loaded gun, where there was no reason to

8    believe there was anybody -- because somebody might

9    get there in the future and hurt themselves with

10   it.

11        So if that's exigent circumstances, I think

12   Officer McAndrew's circumstances in having a report

13   that -- from a woman's aunt that she'd gotten this

14   phone call where there was screaming, and listened

15   to the recording of the woman screaming and a man

16   saying, I'm going to kill you, he tried every --

17   they tried everything they could to get somebody to

18   respond.  Nobody did, even though they still --

19   they had reason to believe there were parties

20   inside.

21        I think that's more exigent circumstances than

22   what was determined to be exigent circumstances in

23   the Janis case.

24        And so I think there were exigent

25   circumstances allowing him to make entry.  And then

1    when he goes into the apartment for the purpose of

2    determining that -- Nicole Delgado's welfare,

3    either on the way in or in taking her back to the

4    living room to find out -- sort out the situation,

5    he sees the baggie and the burnt glass vase on the

6    living room coffee table.  And Nicole just makes it

7    more obvious by trying to stuff a checkbook cover

8    over it during their conversation.

9         So those items were in plain view.  He has a

10   right to be there for exigent circumstances.  He

11   observes the -- the objects in plain view.  And he

12   seizes them.  And they ought to -- to be used as

13   evidence in this case.

14        And so I would ask the Court to deny the

15   suppression motion.

16             THE COURT:  Mr. Gooch.

17             MR. GOOCH:  Your Honor, the answer to

18   the question of, what more should he have done, is

19   on a normal business day in the middle of the day

20   you go to a judge.  That's what the Fourth

21   Amendment says.

22        The warrant requirement ought not to be viewed

23   as a -- an inconvenience.  And it shouldn't

24   plausibly be viewed as an inconvenience when on a

25   Tuesday sometime between 11:22 and before 4:00 an

1    officer investigates a two-day old telephone call,

2    a message two days old.

3         We don't have any information about whether

4    there were subsequent sightings or conversations or

5    whether Marcia Delgado said, and since the call

6    I've talked to Nicole or -- we don't have any of

7    that.  We just have, I listened to the telephone

8    message and then I drove over to 526 A Street.

9         Two officers are there and it's so critical,

10   it's so urgent, the -- the danger is so imminent

11   that they talk to the neighbors -- they knock on

12   the door and they talk to the neighbors and then

13   one of them goes to the police station.

14        And we don't even know where Officer Hruza

15   went, but we know from the testimony that he didn't

16   stay on the scene.  He didn't return when the

17   second troop of officers came to the scene some

18   time later on that day, and we don't know when that

19   was.

20        It's not enough to say, I was going to check

21   someone's welfare and therefore the Fourth

22   Amendment doesn't apply to someone's home.

23        The caselaw says it has to be imminent.

24   Exigent has an imminency character to it.  And a

25   two-day old telephone call doesn't count.  Not

1   answering the door doesn't count.  And especially

2   not when the alternative is you get a judge to give

3   you permission.

4        You have to justify not getting a warrant on a

5   Tuesday in the middle of the day.  It -- it just

6   seems to me to be remarkable that we hear this

7   argument about how urgent it was, that the police

8   officer was out knocking on the door and

9   investigating and then went down to the police

10  station and had a conversation.  And then after the

11  conversation, well, I better go back out and we'll

12  break in.

13       You need permission from your supervisor.

14  Well, the supervisor above the supervisor is the

15  Court.  And it's that simple.

16       If you have time to drive down to the police

17  station and talk to the sergeant and talk to the

18  captain, you've got time to go to the judge and

19  say, hey, Judge, this is what I know, this is what

20  I've learned, can I have permission to break into

21  the house?

22       That wasn't done.  So the question of exigent

23  circumstances gets nowhere because there's no

24  urgency to this.

25       The case that the government likes to rely on

1    involves police officers who respond to a

2    concurrent shooting.  They came out to the scene of

3    a shooting.  They didn't come out two days after a

4    shooting.  And when they got there, they followed a

5    trail of blood back into an apartment where they

6    knew there was a loaded gun.

7        Here, the officers don't know that Nicole

8    Delgado is in the house.  They have the neighbor

9    saying, Nicole Delgado never leaves the house.

10   But -- but that's all they have.  The neighbor

11   saying she never leaves.  Never leaves?  If that's

12   true, then they certainly would have gotten a

13   warrant had they bothered to ask for one.

14       But we don't know actually whether that was

15   something they had the first time or the second

16   time.  We don't know.  We don't know when it

17   happened.  We just know that there was plenty of

18   time to leave the scene -- not even leave an

19   officer there at the door to keep an eye out, to

20   listen for sounds.

21       But, you know, Hruza and McAndrew the first

22   time.  Heermann, Muff and McAndrew the second time.

23   No Hruza.  So it's a fair reasonable inference that

24   Officer Hruza left.

25       If it's urgent -- if it's urgent, you kick the

1     door down or you push the cardboard aside and you

2     unlock it and you go in.  You don't go down to the

3     police station and say, hey, you know, this is kind

4     of troubling, we got this two-day old phone call.

5          With all due respect, this is not exigent

6     circumstances.  The Fourth Amendment requires that

7     there be a justification for not obtaining a search

8     warrant or some kind of judicial permission.  That

9     didn't happen.  And without that justification, the

10    motion to suppress should be sustained.

11         By the way, we don't dispute that if the

12    officer was legitimately in the living room that

13    what he saw was in plain view.  It's incriminating

14    character immediately obvious.  Those are issues

15    that are not raised by this motion.

16         The only question is, was the officer

17    legitimately in the living room?  And we

18    respectfully submit the answer is, no.

19                   THE COURT:  Ms. Fullerton.

20                   MS. FULLERTON:  Well, the matter with

21    Janis was officers who reported to a hospital after

22    a shooting.  The shooting was already over with.

23    They take information from people at the hospital

24    and then go back to the house where they don't

25    expect to -- that there's any -- as far as they

1    know, there's nobody in there.

2        There's a trail of blood leading from the

3    house out to the street where the guy got into the

4    car and was driven to the hospital.  They don't

5    have any reason to believe there's anyone still in

6    the house in imminent danger of anything.

7        Except that the Eighth Circuit said there was

8    still an imminent danger apparently that somebody

9    might wander in, I guess, off the street, find a

10   loaded gun and hurt themselves with it.

11       And if that's imminent -- if that's an

12   imminent circumstance sufficient to justify the

13   officers to walk in without a warrant, then I think

14   this is a whole lot more imminent in this case

15   where the officer -- everything the officer knows

16   is, from all he can determine, is there are two

17   people in this residence.

18       One of whom has -- has reported assault by the

19   other within the past year, which that person got

20   cited for.  One of whom is reported by her aunt to

21   be the person who's -- who's on a phone -- phone

22   recording, that he hears a woman screaming with a

23   man in the back -- in the background or who gets on

24   the phone and says, I'm going to kill you.

25       He has the neighbor telling him that if the

1      white Cadillac is there, the man is there.  And

2      that the woman basically never leaves the

3      apartment.  So he has -- he has reason to believe

4      those people are in there.  He's tried everything

5      possible to get somebody to respond in some way,

6      other than breaking the door down.

7           And defense counsel, with all due respect,

8      says, oh, well, then go fill out some paperwork and

9      see if you can get a judge to authorize this while

10     maybe the guy kills her inside.

11          The officer's got to look at it from the

12     circumstances that he knew at the time.  And as he

13     knew them at the time, there was nothing else that

14     he could -- he knew of that he could do.  He

15     consulted with other officers who came to the --

16     had come to the same conclusion that they needed to

17     go in and check this out now.  They didn't have

18     time to wait.

19          Now, the fact that nothing had happened

20     apparently and there was no problem is of no

21     relevance to the determination as to whether the

22     officers reasonably thought that there was a

23     situation they needed to get into and determine her

24     welfare.

25          So in terms of other cases that have been

1    decided, this is far more exigent than it was in

2    the Janis case.  And Officer McAndrew did have a

3    legitimate reason for going into that apartment.

4                    THE COURT:  Well, first of all,

5    there's no issue as to standing.  So the defendant

6    has the -- is legitimately raising the issue.

7         Secondly, I agree that if the officer was

8    legitimately in the residence, the plain view

9    doctrine applies and there's nothing wrong with his

10   observation or seizure of the items that were

11   described.

12        The real question in the case is whether there

13   were exigent circumstances that would justify an

14   immediate entry into the house.  I don't think

15   there were.

16        And the reason I say that is that there was no

17   evidence of asking Marcia Delgado whether she had

18   talked to or seen Nicole Delgado since she had

19   received the phone message, nor that -- nor whether

20   she had made an inquiry, and why it took her two

21   days to call the police department if indeed she

22   was all that concerned.

23         There was no evidence concerning asking the

24   neighbor about any sightings.  There may have been

25   inquiry as to any loud noises, because there was a

1    comment made that she said that there were -- the

2    only loud noises were loud music.  But there's no

3    evidence as to what the pattern was that -- if she

4    ever saw Nicole Delgado, and how does she knew

5    (sic) that she never left the apartment.

6        Also troubling to me is the fact that the

7    officers left the premises and didn't leave anybody

8    there to observe, to cut off an escape, didn't call

9    for other -- or at least there's no evidence that

10   there was any call made for police officers to come

11   and -- and block all the exits so that whatever

12   happened after a decision was made, that it was the

13   same situation.

14       In other words, that it hadn't -- that they

15   hadn't escaped if there was some harm being done or

16   having been done.

17       The fact that the officer could have contacted

18   the supervisor by radio or telephone is also

19   curious to me.  I -- because it seems to me that if

20   indeed there were that kind of stress and imminent

21   danger perceived, that they would've done something

22   as quickly as possible.  And it wouldn't amount to

23   leaving the premises and chatting about it.

24       Now I understand that may be overstating it,

25   but any conference on this kind of a situation

1    could easily have been over the phone or by the

2    radio.  And I was never given any evidence as to

3    why it had to be in person.

4         It's the government's burden to demonstrate

5    exigent circumstances by the preponderance of the

6    evidence.  And I think all of these questions about

7    there being no evidence of these items, for

8    example, leads me to conclude that I don't have all

9    the story.  But from the evidence that I have, I

10   don't think that there were exigent circumstances.

11        Realizing that other minds my differ, I will

12   put this into writing just in a summary fashion.

13   I'll have the transcript prepared on an expedited

14   basis.  And enter the recommendation that the

15   motion to suppress be granted.

16        With that, is there anything else that we

17   should address in the case today?

18             MS. FULLERTON:  No, Your Honor.

19             MR. GOOCH:  Your Honor, there is one

20   thing that's not related to the motion to suppress.

21        In preparing for the motion to suppress, I was

22   able to contact Nicole Delgado who was unwilling to

23   voluntarily appear and testify.  When I spoke to

24   her I explained to her that I was Mr. Alama's

25   lawyer and not her lawyer.  But she expressed

1    concern that before she was willing to cooperate

2    with my investigation, and I assume before she was

3    willing to cooperate with the government should

4    they be interested in talking to her or whatever,

5    that she was concerned.

6        I took that to mean that she was asking that a

7    lawyer be appointed to represent her, to advise

8    her, either concerning the conspiracy charge that

9    Mr. Alama faces or -- I really don't know.

10       And I tried not to give her legal advice, just

11   to say I'll mention to the judge that you've been

12   difficult for me to get a hold of and you plan to

13   continue being difficult to get a hold of unless

14   she gets access to a lawyer to advise her.

15       I bring that to the Court's attention.  I'm

16   not certain -- I haven't had a chance since I just

17   talked to her last night, I haven't had a chance to

18   research the question of whether Mr. Alama even has

19   standing to ask the Court to appoint a lawyer for

20   her.

21       But I do think the Court should be aware that

22   there is someone who is at least arguably a

23   material witness in this case, not concerning the

24   motion to suppress but concerning the larger

25   conspiracy matter, who is currently being difficult

1    to contact.

2         And what she told me is that that's because

3    she's concerned about her own rights and

4    well-being.

5                    THE COURT:  Okay.

6                    MR. GOOCH:  I guess I'm asking you to

7    consider whether it's appropriate to appoint

8    counsel.  She hasn't asked you for that.  And I'm

9    not going to give her legal advice about how to go

10   about it.  But I think it's important that the

11   Court be aware that I did try to tell Ms. Fullerton

12   earlier about my concern.

13                    THE COURT:  Ms. Fullerton, any

14   comments?

15                    MS. FULLERTON:  No, Your Honor.

16                    THE COURT:  It seems to me that

17   that's something that perhaps a pretrial services

18   officer might be able to at least run down.

19        So if you will give to the -- to the officer

20   an address and phone number, it may be that that

21   can be resolved.  I obviously cannot appoint

22   without having any financial information or

23   anything else.

24                    MR. GOOCH:  Sure.

25                    THE COURT:  So beyond that, I can't

1   go.  Anything else?

2                   MR. GOOCH:  No.  Thank you.

3                   THE COURT:  All right.  We'll be in

4   recess.

5        (3:19 p.m., recessed.)

6        I, Vicki L. Jarchow, Transcriber, certify that

7   the foregoing is a correct transcript from the

8   official electronic sound recording of the

9   proceedings in the above-entitled matter.

10

11  Vicki L. Jarchow            September 6, 2005

12

13

14

15

16

17

18

19

20

21

22

23

24

25